Good morning. First case is number 24-1545, Roger Real against Attorney General. Snort. Good morning, Your Honors. May it please the Court. Emily Thornton, Counsel for Petitioner Roger Esteban Real. I request three minutes for rebuttal. Granted. Thank you. This petition raises two issues. First, Mr. Real was deprived of notice and an opportunity to be heard because the government failed to provide notice that he must apply for asylum within his first year in the U.S. after he turned himself in to the DHS near the border, was processed and released with conditions including ICE check-ins throughout the year, and told he would have a court date you back to the border in Yuma in February of 2022 or March of 2022. So we know he crossed the border. Okay. Did he surrender or was he apprehended? His testimony, which the judge found credible in his written testimony, um, states that he turned himself in. He surrendered into the DHS. All right. In your reply, he refused the term apprehended. I believe it doesn't matter whether he did turn himself in or was apprehended. The DHS would have followed the same procedures typically. However, I think it goes to the fact-specific analysis that Mr. Real had every intention to seek safety lawfully in the United States. He was coming here to pursue asylum. Will you agree that whenever he got into our country and when he first confronted the agents that he did not express any credible fear? Correct. No one asked him. Didn't express it. Correct. Okay. All right. Just wanted to establish those initial facts. Correct. And if the court would prefer, I can skip first to that issue, that the BIA in its decision and the government before this court argue that publication of that filing deadline in the federal register is sufficient notice. The BIA treated this as a bright line rule. However, this is contrary to this court's precedent. In particular, this court and others have held that affirmative notice beyond publication is necessary depending on the circumstances of the case. In particular, whether what information was provided was misleading. How were they to notify him? What would you have had them do? Put a billboard up? Anybody coming in illegally who has an asylum claim needs to make it within one year? What do you do? So it's up to the DHS to determine how to provide information on the filing deadline. They could, in fact, just provide a flyer to people who are processed, like Mr. Real, that includes that information. Pursuant to the Mendez-Rojas settlement agreement, the DHS chose to use the notice to appear as a vehicle for providing information on the one-year Mr. Real. They would have processed him, released him with a notice to appear, the charging document, which would have included notice of the one-year filing deadline. So in that case, we wouldn't be here. He would have been on notice. How about publication in the federal register? So again, this court in Charlesville and other circuits have held that affirmative notice, notice beyond publication is necessary when the information or notice that they were provided was misleading. So in Charlesville... Was there misleading information here? Was there misdirection? So yes. Again, Mr. Real turned himself in. He was processed, held for about a day in CBP custody. He was released with a cell phone. DHS provided him a cell phone to use to comply with ICE check-ins throughout the next year. In fact, later on, when he was able to purchase his own cell phone, they showed him personally how to download an app. The DHS certainly had many interactions with Mr. Real throughout that year in which to provide him notice. He reasonably believed that he was doing everything he needed to, to comply with all conditions on him. Which of their interactions were misleading? So I think we can compare to Charlesville here in which the court was considering... Instead of comparing to another case, just talk about the facts of this case. Sure. Could you answer Judge Porter's question? What was misleading? What was said that was misleading? It was misleading that he was released into the United States. At that point, the only relief available to him would have been asylum and fear. Was there anything said that was misleading? Though I don't think it needs to be a specific statement. I didn't ask that. Was there anything that was said that was misleading? The interactions as a whole were misleading. Was there anything that was said that was misleading? You can answer that by saying no. No, but there was conduct that was misleading. Is that the answer? Yes. Okay. So tell us what conduct was misleading. The conduct that he was released into the United States. Again, at this point, the only relief available to him would have been asylum and fear-based relief. So implicitly, he's let into the United States to pursue asylum. He was told he'd have a court date in three years. He was waiting, in his own words, he thought he had to wait to see that judge in three years. Doesn't somebody who comes to the United States... I mean, I know they're entitled to certain levels of due process, no matter what their category is, but doesn't everybody who comes in have an obligation to figure out what the laws are that apply to them? So absent the misleading information, similar to this case and Charles Well and what other circuits have held, publication alone may be sufficient. That's true. But that's not the case here, because Mr. Rial had these misleading interactions. And reasonably, based on those interactions, believed that he was doing everything he needed to comply with seeking lawful status here. And I think there's a helpful comparison to the class members in Mendez-Rojas in the district court case out of Washington. As Malayne is a fact-specific analysis, it should look to the particularities and the practicalities of the specific case. Similar to the class members in Mendez-Rojas, Mr. Rial was unrepresented at the time he was entered. He was not fluent in English. He was not familiar with the complex US immigration system. He had suffered past trauma. And in Mr. Rial's case, he had just an elementary level education in Columbia. So all these factors combined, along with the interactions that he did have with the DHS over that first year, do combine to create a misleading interaction, which requires affirmative notice of the filing deadline beyond publication. If there was not anything misleading, then publication in the federal register is adequate, even in the immigration context. Do you agree with that? Yes. If Mr. Rial, for example, had no interactions with the DHS, no reason to believe that he was doing everything he needed to and that he did not need to do further research, then publication alone would be sufficient. Correct. And I think if this court doesn't have any further questions on that point, I can turn to the analysis under Matthews v. Eldredge, which I think really will yield the same results and also shows the significant contrast between Mr. Rial's significant private liberty interest here and the low cost, the low burden on the government. So Mr. Rial's interest in asylum here is significant. With asylum, he'd be on a path to a green card, citizenship, as well as have the ability to get status for his young son. With withholding, he has protection, but it's very limited to not being deported to Colombia. And in fact, under the law, he could be deported to a third country. And this government currently has stated its intent to pursue third country removals for people who are granted withholding. So the difference between asylum and withholding here is significant. And also note that Mr. Rial was granted withholding of removal, which requires showing a higher standard. So he had a significant likelihood of being granted asylum without the one-year bar issue. Now, the burden on the government here is small. As I said before, following the Mendez-Rojas settlement agreement, the DHS included information on the one-year filing deadline in the notice to appear, which in a typical case, if Mr. Rial had been treated according to normal procedure, he would have received upon release from custody at the border. So there's a very small burden. They already have notice in a document that under normal procedure, they would be giving to the non-citizen. Are there many people out there in Mr. Rial's category? I don't believe so. I think this is really a rare case. Again, under normal procedure, he would have received notice of the filing deadline. If you take out the members of the Rojas settlement class or classes, and if you assume fewer people are coming in today, that was my focus. I mean, how many Roger Rials are out there? I think there are very few. I think he essentially fell through the cracks. This is a rare case. Again, broadly, what the DHS, their normal procedure at the border provides sufficient due process notice and an opportunity to be heard. So this is a rare case. So just quickly before I move on to the second issue, we ask this court to remand to the agency for further proceedings and hold that Mr. Rial is eligible notwithstanding the one-year filing deadline. The second issue, the agency committed legal error in holding that the DHS's failure to notify Mr. Rial of the one-year filing deadline for asylum was not an extraordinary circumstance. The regulation here lists examples of extraordinary circumstances. However, it's explicitly not an exhaustive list. It doesn't have to be one of these five examples. And the regulation essentially allows for equitable tolling. In Mr. Rial's case, the DHS did not follow its normal procedure. They could have placed him in expedited removal proceedings, given him a credible fear interview when they asked him if he had a fear of return, and he said yes. And then if he passes the interview, serve him with a notice to appear, which would include information on the deadline. Alternatively, they could skip the credible fear interview and just issue him the notice to appear. They chose to deviate from their normal procedure in that case, in Mr. Rial's case, and that's something which he is not responsible for. And I think so that qualifies as an extraordinary circumstance here and is comparable to equitable tolling. I see that I'm short on time, so I just want to close with we ask this court to reverse the agencies. Just ask one follow-up question on this extraordinary circumstances. So the regulation says that if the alien can show to the satisfaction of the Attorney General that it's extraordinary circumstances exist, that the government can review the out-of-time filing. What language could have been used to take that out of the Attorney General's discretion? What other language other than what they did use? So I think the language that they did use does not make it discretionary. And I think because of looking at other language that Congress chose to use within the same section, where they did say the Attorney General determines in the Attorney General's discretion, that's at 1158 B2A Roman numeral V. They could have chosen to use discretion explicitly in the provision at issue here, and they chose not to. And I think a reading... You think they needed to use the word discretion? It's not enough to say to the satisfaction of the Attorney General? I don't think it is here, again, because they chose to use explicitly discretion in the Attorney General's discretion elsewhere in that same statute. And so we should read Congress as doing things purposely. But how does that work with the dicta in Wilkinson? You rely on Wilkinson, correct? Yes. But in Wilkinson, there's dicta that seems to be very harmful to your position. The court, in making its ruling in Wilkinson, says that that case is not like other provisions of the immigration law, which says that relief is allowed if it is established to the satisfaction of the Attorney General. That's 1182 H1B. And then the Supreme Court cites 1182 I1, which also says to the satisfaction of the Attorney General. And then it cites section 1255 L1, which says in consultation with the Attorney General. So that laundry list there doesn't use none of those provisions that were cited by the Supreme Court used the word discretion. Sure. And again, as you noted, Judge Hardiman, that's dicta in Wilkinson. And also, I think we should look within the statute here within 1158. In another provision, the Congress used discretion explicitly. However, perhaps that canon of interpretation does not apply when looking at other statutes 1182 or 1255. So I think in reading the statute 1158 together, Congress could have chosen to use the term discretion in that provision and chose not to. All right. Thank you, Ms. Thornton. Let's hear from Mr. Robbins. May it please the court. I'm Jonathan Robbins here on behalf of the United States Attorney General. Good morning to everyone. This court should dismiss the petition for review in part to the extent the petitioner is challenging the agency's determination that he filed his asylum application beyond the one-year deadline and didn't establish any extraordinary circumstances warranting an exception to that deadline. And the court should deny the petition for review to the extent the petitioner is raising a due process claim. It's well established under the statute that the court doesn't have jurisdiction to review agency determinations regarding the untimeliness of an asylum application and whether an individual meets the extraordinary circumstances exception to that deadline. That was the court's law prior to Wilkinson, and it should remain the court's law after Wilkinson. Just to briefly touch on the point that why this isn't a mixed question of fact and law, Your Honor has already sort of alluded to this already. The statute in this case uses the term to the satisfaction of the Attorney General. Your Honor has already pointed out that the Supreme Court identified that verbatim language as the type of language which delegates discretion to the Attorney General. And so this is a discretionary determination by the Attorney General and not a mixed question of fact and law that would restore jurisdiction. Your friend says they need to use the word discretion. What do you make of that argument? Respectfully, that's wrong. And I would push back on the notion that that's dicta from the Supreme Court. If the statute in the Supreme Court had had the language in the opinion of the Attorney General, which was the predecessor to cancellation of removal, which was being looked at in that case, the Supreme Court pointed out that because Congress had removed that language from the statute, it was looking at the cancellation statute as a mixed question or the hardship determination as a mixed question. But the predecessor statute had a similar hardship requirement that said, in the opinion of the Attorney General. I would note that that language also doesn't use the term discretion. And the Supreme Court said that that's what made the difference in the case. It only made the difference, but it's still dicta. The holding of the case is that it's a mixed question of fact and law. It is, but because of the statutory language, right? That was the statutory language in this case that's the inverse of what was at issue in Wilkinson. Or perhaps not the inverse, but meaningfully distinct according to the Supreme Court. Well, the predecessor statute that they were looking at with suspension said, in the opinion of the Attorney General. And the language here says, to the satisfaction of the Attorney General. But as your Honor has already pointed out, the Supreme Court used satisfaction language in showing the different types of statutes that could delegate discretion to the Attorney General. And even if the Supreme Court didn't say anything about it at all, even if you just look at the plain language, what does it mean to say that something has to be shown to the satisfaction of the Attorney General? Well, that's Congress telling anybody who's reading the statute that it's the Attorney General's call to make. And the Attorney General has since run with that discretion. The Attorney General has promulgated a regulation which specifies how he or she is going to establish what it means to establish extraordinary circumstances. Isn't this, though, a question of law as to whether or not equitable tolling should apply under the facts of this case? No, this isn't. I mean, equitable tolling is set forth in the statute as either demonstrating change conditions or extraordinary circumstances. How about the case of Guerrero-Lasparilla versus Barr? Right. Guerrero-Lasparilla talks about what constitutes a mixed question of fact and law. But isn't this a question of law as to whether or not these are the circumstances under which the one-year bar should be told? It's not. And the reason it's not, there's a decision which is not binding on this court which explains this concept pretty well. It's the 11th Circuit's decision in the APA case which also found that this was a discretionary determination. The court there talks about what we need to do to determine whether something is a mixed question of fact and law and whether something is a discretionary determination. It characterized it as different buckets to categorize things in. And the key to determining whether something is a discretionary determination or a mixed question of fact and law is the statutory language. And again, the statutory language here says, to the satisfaction of the Attorney General. That's how we know it falls into the discretionary bucket rather than the mixed question or question of law bucket. Okay, let's talk about the border. What happened here? Well, it's not entirely clear. If you look at page 113 of the record, the petitioner testified that he crossed the border where the coyotes told him to cross the border. He doesn't specify whether that was at a point of entry. Now, I would note that he was charged under a provision of the INA that charges him with being present in the United States without admission or parole. Your Honor has already pointed out that in the briefing, the petitioner has referred to him as being shouldn't have expedited removal have applied here. He's certainly claiming that it would, that it could have. He got across the border. I suspect he didn't. I suspect that the coyotes didn't tell him the first thing you should do when you get there is look for an agent. Right. I suspect that didn't happen. Correct. And in fact, this is a little closer to apprehension than surrender. Yes, he appears. They have him in some form of custody, right? Once they apprehended him, they took him to the, I assume the nearest entry point. Why didn't expedited removal apply? Well, whenever somebody is brought to inspection after they're apprehended near the border and the border protection will take them usually detain them for a short period of time while they figure out what to do. Now, I don't know exactly what caused their decision. Record doesn't show that either. No, but they decided to release him. And that happens sometimes. Sometimes people are temporary, temporary released into the United States. And, you know, as petitioner was required to do check-in. What was this about the cell phone? I don't understand. They gave him a cell phone. It's supposed to send pictures back on the cell phone. I admit your honor. It's the first time I've heard of that, that somebody has actually given a cell phone. I certainly have heard of the situation where they check in through the app, right? The CBP app is a way for them to facilitate the check-ins with the border protection. I, he, he claims at one point, he got his own cell phone and that they showed him how to use the app. I haven't heard of them giving cell phones out before, but I mean, I, I it's possible. I don't, I don't, I just don't know the answer to that. You know, distorting tries to make the point that when they had this border interaction, whatever it's called legally that they should have told him, look if you have a country of origin, you only have one year to make that claim. Well, they only do that if they actually place them in some type of removal proceeding, whether it's expedited removal or regular ordinary removal proceedings. I mean, I don't know how many Roger Reales were at the border in 2022. If you listen to the news, there were a lot. Well, I imagine many of them were released. I imagine many of them were released and allowed to check in with the CBP. So I don't know that I don't have a number for you. I don't know exactly how many people there are. But I, I imagine that a lot of people had an experience where they were admitted, allowed to temporarily stay in the country while and, and allowed to check in just because of the resources of DHS to be able to process a lot of people. Once he's released into the country, why doesn't he have due process rights? Well, he still has the full bundle of due process rights. It seems like your argument is that he had some limited due process rights. Well, because the case law is clear that even if a person is temporarily released in the United States, they're still treated as an applicant for admission. This is very similar to the Supreme Court's decision in Thuracigian or this court's decision in the Castro case, where those individuals who were also could potentially, those people were actually put in expedited removal proceedings. But, but petitioner, I mean, the petitioners have argued or petitioner has argued that DHS should have put him in expedited removal proceedings. So he's in the same applicant for admission status that. Even if he wasn't, your argument is that those who are put into expedited removal are in the same position as people who could be or should be put into expedited removal. Well, the, even if you're temporarily released, you're still considered on the threshold of the country to resolve your case. When it comes time to resolve your case, you're still treated as applicant for admission. That's 1225A1. So he's still treated as an applicant for admission for whenever his case gets resolved. Now he's of course trying to contend that the DHS should have put him in removal proceedings. But he was only, the only reason he was in removal proceedings and not required to continually check in was because he committed a crime or he was arrested for criminal activity. Yeah. I mean, if he doesn't commit a crime, he's still out there. It's possible. They may have at some point have chosen to put him in removal proceedings. I don't even know where he was. Right. They didn't keep track of him. Well, they did. Well, he was checking in. He was checking in through the app. The record shows he was checking in. But it doesn't, well, he says that they showed him how to check in and I don't know that the record shows it definitively, but I mean, I assume. And the record doesn't seem to show anything from the time he left the border till the time he was turned over to ICE because of charges. Well, other than his sort of implicit declaration, his declaration, which talks about how he had the app to check in. And it's sort of implicit in his declaration that he was checking in. I don't know. I can't say that for certain you're right. The record isn't entirely clear on that point. All right. But Ms. Thornton said, I said, are there many Roger Reales out there after the Rojas settlement? What's your answer to that question? Well, I mean, obviously the Rojas settlement is limited because it was limited to a particular cutoff date. Right. But I imagine there, well, in the current situation, I doubt that there are a lot of people being released if they come to the border without documents. At that time, there may have been quite few. Again, I don't have exact numbers for you, but I don't know that it's a small amount of people. It's difficult to say. I don't have any concrete information in that regard. But I think it's too much to assume that there's very few people in the situation that Mr. Reales finds himself. What would be the burden on the government to just like on this app, say, every time you pull up the app, maybe you have one year to make an asylum claim. You have one year. You have one year. Well, I mean, where where would it stop? I mean, asylum is a particular form of relief, but there are all different types of forms of relief. I mean, do they have to include the entire statute book to the petitioners? I mean, look, if he had expressed a fear and the government had misled him in some way or said something that was wrong or even maybe not said anything at all in light of an expressed fear or a desire to seek asylum, then OK, maybe there'd be something to talk about. But Congress has said that applicants for admission are only entitled to due process that Congress authorizes. And again, he had constitutionally sufficient notice because the statute and regulation have both been published in the Federal Register. And the case law is very clear that ignorance of law is not an excuse. And he only gets the due process that authorized. And nowhere has Congress authorized or put a burden on the agency to affirmatively tell people about asylum or attended deadlines or any or sorry, or any other form of relief. What do you make of the argument that collectively all of his dealings created a misleading context, some kind of a misleading context? Well, there's no specifics. And I would I would rebut that. There is some burden on an asylum seeker to figure out what the laws are. I mean, their brief opens up with the notion that he came here to seek asylum. At some point, you have to express a fear or demonstrate an intent. Again, not only does the statute not put an affirmative duty on the agency to inform anybody about attendant asylum deadlines, but it actually puts the burden on the non-citizen to indicate that they're seeking asylum or to indicate that they have a fear, right? The obligations of the agency in the statute don't kick in until the non-citizen actually does that. So it's not even that the statute doesn't require what they demand. It really shows the exact opposite and puts the burden on the non-citizen to do what the petitioner is asking. I think that's it. I mean, we've covered mixed question. I think we've covered due process. If your honors have no further questions. All right. Thank you, Mr. Robbins. We'll hear rebuttal from Mr. Thornton. Thank you very much for your time, your honor. Your honors, I just have about five points to get through and less. I'd like you to address the Wilkinson question. How do you get around Wilkinson? Sure. So again, I think we can look at the specific section in which discretion is used elsewhere, but not in this specific provision. However, I think to the satisfaction of the attorney general generally means that it is the attorney general or his delegate who has the decision-making power here and the burden is on the non-citizen. I think that's what that should be interpreted to mean. I would also like to note that the Supreme Court in Guerrero-Lasprilla explains that there's a presumption in favor of reviewing agency determinations. So I think to the extent there's any uncertainty, that presumption should prevail and this court should find that it can review this issue. And also in Guerrero-Lasprilla, I think this is clearly a mixed question of act and law. In that case, they were considering whether a legal standard was properly applied to a settled set of facts and that's what we're asking this court to do here. The facts are undisputed. We're just asking this court to consider whether the legal standard for extraordinary circumstances was applied appropriately. And then I do want to notice as far as equitable tolling, which I believe my friend noted is comparable to the extraordinary circumstances standard here. This court, as noted in Jones v. Morton, has held that equitable tolling is appropriate when a plaintiff receives inadequate notice of her right to file suit or when a plaintiff is misled into believing that she has done everything she needs to in order to pursue her rights. I think that's very similar to what happened with Mr. Real here. Next, I would like to note that contrary to what my friend said, we are not claiming that the government should have placed Mr. Real into expedited removal proceedings. Just that under typical procedure, that was one of the options the DHS had available to them. They could have placed him in expedited removal, they chose not to. And also, it's not correct to say that... So why does that hurt them? Well, for one, I think... It sounds to me like they made him a non-citizen as opposed to an applicant for admission. That's true, yes. He was never treated as an applicant for admission. Under Section 1225, if they had, they would have placed him in expedited removal. And it's true that thursigium would have applied, he would have had limited due process rights. However, the DHS, in their discretion, chose not to. So after he was processed and released into the US, he had due process rights under Plyler v. Doe, his advice, like any other person present in the US, regardless of status. I would also like to note as far as when he was released, he did not express to border officials that he had a fear of return. However, the only relief available to him at that point would have been asylum. So if he wasn't seeking asylum, I think it would be confusing as to why government chose to release him into the United States at all. Asylum and related fear-based relief were the only options available to him. So with that, if the court does not have any other questions... Thank you very much. Thank you to both counsel. The court will take the matter under advisement.